Hear ye, hear ye, hear ye. The United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States in this honorable court. Good morning, gentlemen. Thank you for participating in the argument in this unusual fashion. We're very anxious to get back to New Orleans, but unfortunately, this is not the appropriate time. However, we're going to observe essentially the same rules that we usually do, principle one of which is no video audio recordings. And I'm going to duck back here and put my phone on mute, which I should have done yesterday at a timely basis. But that's something I urge you to do. And then we will proceed as usual, except that we're because there may be little delays in voice transmission. We will give you the first five minutes of your argument uninterrupted. We also very much appreciate record excerpts or record citations when you can give us those. And with that, we call the first case of the morning, number 19-50717, Belliveau v. Barco. I think that's the proper pronunciation. Mr. Cole. Thank you, Your Honor. May it please the court, Scott Cole for the plaintiff, Richard Belliveau. And Mr. Belliveau is appealing an adverse summary judgment ruling, the first issue being veil piercing. And the gist of our appeal on that issue is the district court wrongly granted summary judgment, not based upon the elements of this statutory claim, but instead based on the district court's own opinion of the legislative judgment behind the statute. And that's reflected at record site 8760, which is the order denying Belliveau's motion to reconsider where the court drove the nail into the coffin by explaining that the plaintiffs had failed to address the a legislative judgment that contract claimants, unlike most third parties suing in tort, have voluntarily chosen to deal with the corporation and absence of deception or fraud would have had the opportunity to apportion through negotiated contract terms, the risk that the entity would be unable to meet its obligations. So what the court did in granting summary judgment was to look behind the statutory text and the statutory language to what the court perceived as the legislative judgment reflected in that, and then granted summary judgment because the court felt that the plaintiff had failed to show some extra statutory requirements. And instead, we believe the proper course of action would be to take the statute section 21.223, which lays out the like Mr. Belliveau to pierce the corporate veil, and then apply all of the evidence to those elements and then come to a conclusion on summary judgment that did not happen below. And that's what we're seeking this court to review. The court also, in addition to that point, claimed that essentially any fraud that would be used to proceed the transaction in question. And I think that was based again, upon the court's view that the plaintiff had to show that he was it was the that the defendants wrong interfered with his ability to contract upfront. And in this case, that would be back in 2007. But that's an incorrect statement of the law. Because again, there's no statutory requirement that the actual fraud predate the contract in question. If the legislature had intended that to be the case, it could have easily included that requirement in the statute, but it's absent. In addition, the classic veil piercing situation, which is a company owes unwanted debts, it then transfers assets from that company to other affiliated companies with the owner. That's a classic veil piercing context. And that happens in the classic case, after the contract is entered, and after the debt has been incurred, and frankly, after the defendant realizes that the debt is there and does not want to pay it. So again, we believe that is an incorrect legal position that the district court articulated here. And a proper application of the statutory text to the evidence, we believe shows that the jury should get to pass on the question of whether Barco's actions here do in fact represent actual fraud. So I will move next to the evidence that we presented to the court on the actual fraud question and why we believe that that is sufficient to get to the jury on this case. The gist of the actual fraud here is that Barco used its control of high-end systems to force high-end systems to grant Barco a sweeping license to every bit of IP that high-end systems or Mr. Bellevue had or ever will have in the future for a grossly undervalued amount. And importantly, for the actual fraud analysis, it did so in order to avoid the threatened patent infringement liability that Mr. Bellevue had articulated weeks before that transaction. And again, that is a classic marker of actual fraud. When the corporate form is used in order to avoid liability, that is a classic marker of actual fraud. And because of that, Barco was able to use its control of high-end to enrich itself with an IP license that's worth far more than it had to pay, and in the process, also neutered a potential liability before it could ever even be filed. In addition to that, the actual fraud was demonstrated further by the fact that Barco falsely claimed in that license, in the text of the license, that this license was legitimate because there was a prior, quote, informal license that Barco had had all along. And that statement, however, we believe is false. And at the very least, that is a fact question for the jury to decide whether that claim was false. And that claim... Mr. Cole, I have a lot of questions about this theory. First of all, is it not correct that the license your client entered into with counsel in 2007 was a non-exclusive license? The 2007 license is exclusive. My understanding was that it... Well, it's exclusive to Barco, correct? Correct, with the right to sub-license. With the right... But the right to sub-license was completely unlimited, correct? Not quite, Your Honor. It is limited in that that contract obligated high-end systems to use commercially reasonable efforts to commercialize his IP. That's the core of our breach of... The underlying breach of contract claim. Right. Well, how do you know going forward that that would not occur even after this transaction? That... I'm sorry, that what would not occur? Commercially reasonable sub-licenses could be made by the acquiring company. They certainly could. And throughout the history of Mr. Bellevue's underlying license, roughly a dozen of those licenses were negotiated. And in each instance, Mr. Bellevue was involved, approved of them, and considers them to be commercially reasonable. Well, some of them were, yeah, and some of them were licenses, cross licenses with no royalty, right? Some were cross licenses with no royalty. Some involved business consideration to high-end systems, either in lieu of or in addition to cash consideration. But again, Mr. Bellevue had the authority to assess his views and to avoid disputes. Well, but couldn't he have negotiated in 2007 to have express approval of sub-licenses? I understand that happens quite often. He... In theory, he could have. Instead, they had a... He did negotiate instead to allow them discretion subject to the obligation to be commercially reasonable. And by the way, is Mr. Bellevue connected with ECS now? ETC? Yeah. He is a consultant for them, working on a contract basis to invent new lighting equipment. So what he walked away from in 2017 or he's doing now. And the other question I have, so does that explain why he never sued Barco for breach of contract? You mean high-end systems? Yeah, high-end, excuse me. Sure. That's a natural question that the district court also addressed. And I'll answer that now. Why did Mr. Bellevue not sue high-end systems? Why did he go to Barco? The reason is that the provision at issue here is a provision where when high-end sub-licenses its IP, Mr. Bellevue would get half the consideration and high-end would keep half the consideration if it came in form of cash. And that is, in a way, I think of it like a contingency fee relationship. The only way high-end owes Mr. Bellevue money on that provision would be if money were coming in that he could then get his portion for. Here in this case, the consideration high-end received for the Barco sub-license was, we believe, grossly inadequate. And therefore, high-end does not have the money that it should have had to pay him his share. And he believes, I mean, it may sound hokey, but he believes that that would be wrong to do that. And he believes, I think quite correctly, that it was Barco that engineered the transaction that is the wrongdoer. And we looked at the statute and said, we think we can establish these elements. We can sue Barco because we do believe they are the wrongdoers here. Well, there is also a problem. I don't understand the economics of the transaction. And maybe tell me if I should ask opposing counsel. High-end was sold for $7.5 million cash, period, end of story. And that number did not change, notwithstanding the last-minute exclusive license given to Barco. So what does that suggest about the value of this company? I mean, it suggests the value of the company was $7.5 million. But the value, the IP license is different and was addressed by Mr. Bellevue's expert using traditional IP license valuation. I understand that theory. And I haven't read the expert report. I understand that theory. But if Barco didn't demand more money for the sale of high-end, how did Barco have any assurance that high-end, once acquired by ECS, was going to do a better job commercially licensing this high-end technology? Why not? If it's worth $180 million, if I was an acquiring company, I'd want to take advantage of that. And if I was a selling company, I'd want to take advantage. Sure. Let me answer that. The transaction, a couple of things. Number one, the concept that Barco would be getting a license back was not a last-minute addition. It was included in the letter of intent from the very beginning of the transaction that established the price in the first place. So the price was $7.5 million with a number of terms. One of those was there would be a license back negotiated. So that was baked into the price from the beginning. Second, this license negotiation was done over a couple of months, and there is zero evidence that either party in that contract looked at the value that was going to be transferred by way of that license. In fact, when we asked them— That's irrational. That's an irrational idea, in my view. If somebody's buying a company, they're buying the totality, especially including valuable IP rights, or they're letting them go for reasons that are very mysterious. Well, Barco entered into this agreement from the beginning saying, as part of the sale, we get a license back. That was part of the deal from the beginning. Whether that value was a dollar or $300 million is not important for the economic analysis. The economic analysis was it's included in the $7.5 million upfront. The economics do not change because of the addition of the license because that was priced in from the beginning. So your theory is that the whole purpose— I mean, they had to sell high-end because it was making no money, number one, even with Bellevue's valuable IP technology. Their brief says they had lost $100 million on high-end. That's either true or not true. But you're saying this sale gave Barco an opportunity to steal the other 50 percent of the exclusive license away from Bellevue. Is that your theory? Not exactly, Your Honor, no. Our theory— Try again. Our theory is that when the transaction went forward, number one, Mr. Bellevue had threatened IP litigation against Barco, who was unlicensed, and ETC, who was unlicensed. They negotiated this license agreement, which, again, was contemplated from the very beginning. And how that number came to be, which is a good question for the economics, right? How did the negotiation lead to this price? Barco and ETC both claimed common interest privilege over the entirety of those negotiations, meaning they considered them to be a legal strategy to defeat Bellevue's claims. That is the opposite of a commercial transaction. When you have a negotiation between two purportedly disinterested parties, but then you claim common interest privilege successfully and refuse to answer any questions about how the economics of that deal came to pass, we believe that cannot be decided on that question. So you don't have a— Yeah, but you're not telling me, you're not persuading me, as you would have to persuade a jury, what your ultimate theory is. Our ultimate theory is that at the outset, when it set out to sell this company, and Mr. Bellevue threatened them with an IP litigation, they decided, we want to kill that litigation before it gets started by way of a license agreement. We are not going to include Mr. Bellevue in the negotiations, and we are going to agree to a price that is cheap. But he didn't have a standing because he had given them an exclusive license, right? He gave them an exclusive license subject to high-end obligation to use commercially reasonable efforts. And here, this was, again, a privileged negotiation. It cannot be a commercial negotiation. It cannot be an arm's length negotiation in that context. And that common interest privilege claim, which was sustained, we believe demonstrates what was happening here. And another important point here, Your Honor, is— You did not appeal that point. You did not appeal on whether the judge properly granted privilege. That's right. We're not disputing the privilege. We're simply saying the fact that it was made and sustained demonstrates the nature of those negotiations as non-commercial and instead litigation strategy. It goes to the purpose, which is part of the actual fraud analysis. What is the purpose for what you're doing? And if your purpose is to defeat legal claims, that's a hallmark of actual fraud. That's our position. Okay. And in addition to that, Your Honor, the face— This is a remarkable fact. The face of that license says that the consideration provided shall not be considered to be fair value for the IP rights transferred. And it even said the reason for that. The reason was because it was a wholly owned subsidiary. That is proof positive that the motivation and result of that license negotiation was driven by Barco's abuse of the corporate form of high-end system to engineer a transaction that even the agreement itself admits was not fair value. Let me ask you this. Let's assume that Barco was going to be completely above board and honest about making this transaction. I mean, high-end had the right to sublicense to Barco. Correct. They didn't have to notify or get the approval of Bellevue. So how would this transaction come out differently? I mean, they could have done it and then they would just argue about it later, right? That's certainly one possibility. I mean, we understand it is correct. They were not obligated to involve Bellevue. In the past, they always had, I think, for that exact reason. They didn't want a debate. So they said, listen, Richard, you tell us whether you agree this is commercially reasonable. And if you agree, then we're comfortable. They didn't do that here. They weren't obligated to do so. But in doing that, they opened themselves up to the argument that we're making here, which is that this was not commercially reasonable. And it says it on the agreement itself. It says it was not fair value for the IP rights received because Barco wholly owned high-end systems. That's in the agreement itself. They falsely claim they already had what's called an informal license to cloud the issue and make it look like, this is the reason the price was so low. But they have yet to this day articulated a single case, a single legal theory as to what an informal license even is. How could it have arisen? What are the elements of an informal license? How did they meet the informal license? There's nothing on any of that. And we believe that shows, at least the jury can decide whether that was a false statement in the contract as well. Again, which gets straight back to the elements of actual fraud. Let me ask you one final question, because we're letting you run way over, or our questioning is running way over. What would your damages be based on? Aren't we three years down the road from that acquisition? Yes, Your Honor, that's right. The damage analysis is, it basically, we have two experts who look at the scope- I know you have experts, but I'm asking you, what do you know about whether Barco has made reams of money at the expense of your client in the ensuing three years? Well, we had projections at the time. There are now, I guess, actual financial results that demonstrate how much revenue has been brought in as compared to the calculated royalty rate that was based on the prior licensing history of this portfolio. And is there still money lost? Yes, Your Honor. The money lost is the difference between the fair value of the rights transferred- I know that. I'm asking you actual damages, not what your expert hypothesized. But three years down the road, what do you, I mean, you know, Barco, I assume Barco's a public company. I could be wrong. So you've got some kind of 10K or something to go off of. So have they made money off this? Yes, Your Honor. I don't have this split of year by year of the damages analysis because it covers a backward-looking period and a forward-looking period. But each year- I'm sorry? All right. Whatever. You have time for rebuttal. Yep. Mr. Utley? We can't- You're muted, Mr. Utley. You're muted. Unmute yourself. Nope. The mute button is on this Zoom. Mr. Utley, look in the bottom left of your little window there, of your personal window space. Is that working? Finally, yes. My apologies, Your Honors, and good morning. Jay Utley of Baker McKenzie on behalf of Barco Incorporated and Barco NV. Judge Jones, you asked the question that I think is central in our theory is breach of contract claim. And in asking this court to grant summary- to reverse a grant of summary judgment on his breach of contract claim, Mr. Bellevue is asking this court to expand shareholder liability under Texas law in a number of ways, but many of them improper. One of them is he's asking this court to deem the alleged breach as also the actual fraud necessary to pierce the corporate veil. In other words, he collapses the analysis and says, my contracting party was required to use commercially reasonable efforts. I don't believe they used commercially reasonable efforts, and because they were so unreasonable, that itself is actual fraud sufficient to pierce the corporate veil and hold the shareholder liable. And he does this despite the Texas legislature enacting the Texas Veil Piercing Statute. As I know, the court is well aware, in response to what was perceived as a significant expansion of veil piercing and shareholder and director liability by Texas courts prior to its enactment. And so upon enactment, the statute limited when a corporate contractual obligation could be imposed on a shareholder to only that situation where the shareholder actually uses the corporation for the purpose of perpetrating and did perpetrate an actual fraud on the obligee. This court has repeated actual fraud is characterized by deliberately misleading conduct. And for all of his complaints about the sublicense agreement, the one thing Mr. Bellevue does not point to is any deliberately misleading conduct on the part of the shareholder here. The license and royalty allocation agreement, that sublicense that he points to as so unreasonable that it's not only a breach of his contract with high end, but it's also the actual fraud necessary to pierce the corporate veil. He points to the price disparity that he claims. The disparity between the cash consideration given and what he claims is the fair market value of the IP. And yet, what he never acknowledges is that in the almost decade that Barco owned high end, they entered into only four sublicenses. Four. And two of those, half, resulted in no sublicensing fee at all. Not a de minimis one, but none at all. And yet, he characterizes those transactions in his brief as consistent with his best interest. That's in his brief at page 21. He also never acknowledges that in addition to the cash consideration and the four year noncompete that was provided by Barco to high end systems, in addition to both, the agreement also requires Barco to pay royalties at the conclusion of the noncompete on any future sales or remain subject to the noncompete indefinitely. And the amount of those future royalties is subject to the party's negotiation and requires high end's agreement. He never places a value on the noncompete. He simply compares what he claims is fair market value with the monetary consideration provided only. Of course, the agreeing parties said that the monetary consideration should not be used as precedent or indicative of the actual value of the negotiate a reasonable royalty to be paid in the future. They did not want that cash consideration being used by either party as a statement of what a reasonable royalty on the IP should be. Now, the idea that this sublicense should be entered into was not concocted by Barco. It was concocted by ETC. It was the suggestion of Mr. Bellevue himself. Well, I think you're making it's one thing for you to suggest for a person to suggest that when he thinks he's getting half of the royalties. It's another thing for him to say. I think that's just the rhetorical point on your part. Be that as it may, your honor, it was his suggestion and he suggested the reason for it as a matter of sound legal risk management. That's in the record at 7488. He was saying that if you divest high end, it might be wise to take a license back. However, that's not for me to say. He had never to that point in his almost decade of employment with Barco ever suggested that Barco needed a license to his patents. He testified affirmatively that he had never stated that Barco infringed his patents, that neither he nor anyone else at high end had never suggested they needed a license. And in fact, in 2012, if what you're trying to like a contract case, except for the way in which your client documented the transaction, which is highly nonstandard, correct? Your honor, I would disagree forcefully that it was nonstandard. Barco entered into its own undisputed that Barco entered into arms-length negotiations with the acquirer of HES, ETC. It's undisputed that ETC is. I'm sorry, let me be more precise. And I am interested in your expanding a little. I think I'm understanding what your conception of the economics is, but what about the representation that Barco had some informal licensing going on? That was not accurate and it doesn't represent the law. And then what about the representation that this $7,500 is artificially low and not to be taken as anything for the future? Now this, I mean, I don't understand the purpose of those provisions in an upright commercial sense. Let me take those questions in order, your honor. Number one, if you could help me with the first one again, the informal license was the second. What was the first? That was the first one. The second was representing that 70 explicitly representing that although this exclusive license is for $7,500. Was that it? Yeah. Although that license was the sub was the sub license to Barco an exclusive sub license? No, your honor. It was non-exclusive and the cash consideration paid respectfully was $75,000, not $7,500. Okay. And it was $75,000 plus a four year non-compete agreement for the past almost decade of the company's ownership of high end. It had sold commercial lighting products under the name Barco lighting systems. And the parties agreed that it would be a terribly worthwhile thing for a company with the name Barco to not be selling competing products during the initial phase of high ends going back to its former name high end systems and being owned by a second company. Now it's undisputed in the record that ETC did an extraordinary amount of due diligence. Mr. Bellevue himself testifies to providing extensive information about his patents and about his Barco's products covered by those patents all as part. But if the if the bottom line is that ETC was only willing to pay seven and a half million dollars and that the Barco had lost a hundred million according to your brief in the past few years, then why, I don't understand what Barco, you know, what's Barco trying to protect at that point? They divested a lemon, right? They did divest a lemon and they were acting on the advice of their former chief technology officer that it would be prudent to avoid risk in the future to take back a sub license to that technology. They negotiated that. It's undisputed that ETC's general counsel testified that he, David Moran, ETC's outside counsel, Carolyn Venary, general counsel for high end and Barco Inc. at the time, and Heiko Burrow, outside counsel for high end and Barco Inc. at the time, were involved in the negotiations of this licensing agreement after ETC's due diligence. The lower court even acknowledges the due diligence that was performed by ETC. That's with an understanding that Mr. Bellevue contended that Barco, certain Barco products were subject to his patents and that those products, Barco had been allowed to produce, manufacture and sell for a decade without a hint that they needed a license. No, no, that now you're playing with semantics in my view because that was high end renamed Barco. Right? As a subsidiary of Barco. No, your honor. In the due diligence process, the first time the company considered selling itself in 2012, Mr. Bellevue was asked to do an analysis of Barco products, not Barco lighting systems products. I know, and he said they were mixed together, but that doesn't mean he didn't have a contract with an exclusive right in the You have no legal authority for this position that the parent company had any kind of informal, you'd have to, I mean, you don't have any authority for it. That statute of fraud, if nothing else. Your honor, respectfully, I believe precedent holds that the conduct of a party toward another party. Where do you have that in the patent license context? What's your best case in the patent license context? Because I didn't see you cite a case. Can you tell me? If you'll give me just one moment, your honor. Well, you can bring it up. You can send us a letter later on if you've got it, but I thought it wasn't there. I will do so, your honor. I believe I'm wrong, but I read the briefs pretty carefully. That is certainly clear. Mr. Utley, the informal license that the document claimed Barco had was also lawful free. Your honor, I could not hear your last words. Could you say them again? The informal license that you, that the document represented Barco held was said to be royalty free also. That was the agreement of the parties negotiating this contract, including the party acquiring high-end systems, which we have argued. No, no, I'm talking about the agreement that you memorialized in the document, the informal agreement that Barco had an informal license. You said it was a royalty free license in the agreement. I mean, in the memorialized agreement. Memorialized agreement. Yes, your honor. Based on ETC's due diligence and Barco's understanding, it had operated for a decade selling products that Mr. Bellevue knew were covered by his patents. And he consented to the making use and sale of those products. And Barco did not pay any royalty during that decade of use of that technology. Now, did Barco and high-end separate their product line completely? Or were they intermixed? Your honor, I am not certain that I can answer that with precision. I know that high-end was acquired so that Barco, which did not sell professional stage lighting products to my into the sale of stage lights. And so my understanding is that those product lines were separate, that high-end sold performance theatrical stage lighting and that Barco sells, it's a highly diversified company, but sells displays, projectors, and other forms of products. Now, a Barco official signed off on the 2017 agreement for high-end. Did high-end not have an official or was he an official of both companies or what? He was an official of both companies, your honor. Scott Brown was an officer of both high-end and Barco Inc. and an employee of Barco Inc. And Scott Brown signed on behalf of high-end systems. There has not been a contention thus far in this case that Mr. Brown was acting apart from the interests of high-end or was breaching any fiduciary duty to high-end. So it has been undisputed that he signed on behalf of high-end and outside counsel Heiko Burrow being involved in those same negotiations. Mr. Bellevue also said that in the conversation he had with the Barco official about what product Barco was using that had based on Bellevue IP that she promised to keep him advised about the progress of the negotiation. Your honor, what you've just stated is attorney argument from the briefing, but that falls apart on a read of the actual testimony underlying it. At one point in the briefing, there is no citation to underlying testimony at all. It is just characterization. And in another part of the briefing, there is citation to Mr. Bellevue's declarations. And a read of those declarations, I would submit, demonstrates that they do not, in fact, say what is characterized in the briefing. In fact, when the lower court, after an in-camera review of all the privileged communications of those attorneys at issue during the relevant time frame, came to the conclusion that what Mr. Bellevue was saying was told him was not as he characterized it, even in his declaration. And in his declaration, I would submit that it does not support the attorney argument made in the brief. Mr. Rutley, is there any record evidence that sort of goes to the purpose of including the pre-existing license clause in the sublicense? Is there any record evidence as to that might illuminate why it was included? Not to my knowledge, Your Honor. It was included as a recital rather than a representation of warranty. It was not a rep or warranty on the part of Barco. Instead, it was included as a recital. But only what is on the face of the document is my understanding. And that's because you claimed a legal privilege against speaking about the background of the document, correct? Your Honor, we claimed legal privilege over certain of the communications between ETC and Barco. It should be noted that we produced over 300 of those communications from these negotiations and the negotiation of the stock purchase agreement. We withheld only 43 of those communications as containing privileged information. Well, numbers won't answer the question, however, which is why is there no testimony about this provision that your opponent focuses on directly? Your Honor, if I am not recalling of a Barco representative, I am absolutely certain that Mr. Cole will remind me, but I am not recalling it sitting here at this time. Well, the lawyer that talked to Mr. Bellevue about the IP that's being used in Barco product, it looked what was his or her name? It actually, my understanding is it was an employee of Barco that has been deposed in this matter, a woman named Sophie Brotz. Okay. Was she also an employee of High End? No, sir. No, your Honor. Were the lawyers working both for High End and Barco? Mr. Verhagen is the general counsel of Barco NV. Ms. Venneri at the time was general counsel both of Barco Inc. and of High End Systems. And those are the two attorneys that have been named and at issue in these proceedings. Okay. So who negotiated on behalf of High End, if anybody? Your Honor, as I mentioned before, Corey Everts testified and no one has ever testified to the contrary that these individuals, no one has testified that they did not participate. I know personally as an officer of the court, they did participate. And Mr. Everts testified they participated. And that is Heiko Burrow of Baker McKenzie on behalf of High End Systems and Barco Inc. and Carolyn Venneri, in-house counsel, general counsel of both High End Systems and Barco Inc. Isn't it a bit problematic for you to be representing your partner in case, suppose he was called as a witness? Well, your Honor, I am merely stating the fact in response to the court's question. But is it your contention at this point that Barco did not violate the exclusive license agreement with Bellevue? Your Honor, to be precise, Barco did not have an exclusive license agreement with Bellevue. High, High End, excuse me. High, excuse me, High End. Yes. Yes, your Honor. It is our contention, though it is not, it's not what we moved on, but it's our contention that there was no breach. There has been not even an attempt by any expert to value the actual consideration provided by Barco. I'm not talking about damages. I was just getting at their point is that they said that you did not raise until the appeal the idea that there had been no breach of the original license contract. In the appeal, they argued that the price given for the sub license was commercially unreasonable, which is a breach question. Well, they responded. Well, they argued that in the court below, and they didn't produce any evidence about it until the motion for reconsideration. And then I think liberally read the district court took that into consideration. And that's plaintiff could have contracted around it. But I did not take your position in the court, in the district court to be we never breached this at all. What you're saying is it wasn't fraud. You were not necessarily saying it. You did not put on paper that there was no breach. Because you're correct, your Honor. And because of the conflation of those issues, we have simply argued not only is it not a fraud, there is not even evidence that it is a breach currently. Well, Bellevue didn't get a royalty, did he, out of the sublease to Barco? He didn't get a what, your Honor? A royalty. When high-end sublease or sub license to Barco, there was no royalty that I saw being in the record paid to him. Your Honor, my understanding is he would be paid half of the $75,000 fee that was provided at that time. And then upon negotiation and payment of royalties going forward, after the 40-year non-compete, he has a contractual interest in those royalty payments going forward. Well, somebody owed him half that $75,000, didn't they? I believe so, your Honor. But he wasn't paid. I have not heard that contended in the briefing or in the court below. That has not been an issue. So I cannot conclusively verify that he received a check for $37,500, but that is my understanding. Mr. Bellevue says that the option that he had with respect to his future IP was never exercised, and you, or at least the instrument says that it was. Is there any record of the exercise of the undisputed, your Honor? Mr. Bellevue denied it. I believe that may be a misunderstanding, your Honor. Mr. Cole is shaking his head, and that too has not been an issue in this matter. It has been undisputed that prior to the divestiture, High End exercised its option to future technology under the exclusive license and option agreement that it held with Mr. Bellevue. Okay. All right. I think that's enough for your argument, sir, and we'll go back to Mr. Cole's rebuttal. Thank you, your Honor. A couple of quick points, and then I want to address some of the ETC questions. First, with regard to the informal license, Mr. Utley, I think, misspoke. It is included within Article II, Section 2.1 of the license agreement, as well as the recitals. Second, with regard to the privilege claims, to give the Court a sense, I asked their corporate representative on the license negotiation, how did you come up with the $75,000 amount here? He was instructed not to answer on privilege grounds, and he did not answer, and neither did ETC. So, there was, the fundamentals of that negotiation were covered in privilege. So, going back to the ETC posture, because I think this, I'm trying to go to Judge Jones's questions about economics, and one thing to keep in mind in terms of the license is that ETC was not in a position, because they did not own high-end systems, to exercise the normal negotiating leverage a patent owner has, which is, if they don't like the terms, they can terminate discussions and file suit. Because ETC didn't own the company yet, if ETC didn't like the financial terms, its only recourse was to walk the entire deal, and if they wanted the deal and agreed in the letter of intent that they would include a license, they kind of crossed that bridge early on, but they did not have the ability, like a typical patent holder would, to say, listen, you're under, your price quote is way too low, I'm going to sue you. If they did that, the whole deal blows up, and that's what complicates and creates jury questions as to what is the significance of ETC's role in this negotiation. Whatever one may think of it, it cannot be a summary judgment determination that it must be read in one and only one way favorably. Let me ask you one question, and that is, I understand the license from your client to high end was an exclusive license, but there was no limit on sub licenses, and I understand that the license from high end back to Barco was a non-exclusive license? Correct. So your client, so what would prevent high end, once acquired by ETC, from commercially realizing on that license? The reason would be that the fee was a flat fee, $75,000, it did not matter how much they sold. No, because high end simply gave Barco a license, but it could have given out five other licenses at royalties to other people once it was acquired by ETC, is that not correct? ETC can continue to license the portfolio to other players in the market today, that's correct. So how can we say that the license to Barco fraudulently deprived your client of all the allow sub licenses? We do not contend that that license robbed his underlying license of all value. Our contention is simply that this transaction was not commercially reasonable, and we dispute that the value paid was not commercially reasonable. The question ultimately of whether that's a breach is the underlying breach of contract claim, which Mr. Uppy recognized was not at issue in this appeal. That's the underlying breach, which still needs to be litigated below, and they have the opportunity to argue whatever they want about whether this was, in fact, a breach of its obligation to use commercially reasonable efforts, and they can make that argument and anything they want. But that was not argued below, and we have not had a chance to marshal our evidence on the underlying breach question, although there is certainly some overlap. One last thing, I think I made this clear earlier, but it came up in Mr. Utley's argument, was that the statement in the license that they were not paying the fair value of the IP gives one and only one reason for that, and it is not the non-compete, which, by the way, was also in the underlying stock purchase agreement. So from the very beginning with the LOI, it was contemplated that there would be a non-compete agreement as part of the deal. The non-compete in the license simply mirrors that larger deal term, and we argue, which means it doesn't really offer much of anything in added value within the license itself. But again, the only reason the license gives for why the value was underpaid was because of Barco's ownership of high end at the time of the transaction. It does not say that it is because of the non-compete at all, and we do not see any way that it would be proper to infer that that was the reason in the face of directly contradictory evidence in the document. Okay, we've explored this about as much as we're capable of doing without having the record before us, and we appreciate your effort to answer our contentious questions, or at least mine. Thank you very much. Thank you, your honor. Thank you, your honors.